**VICTORIAS MILLING CO., Inc., as Owners of THE M/V NONSUCO, Appellant,**

v.

**PANAMA CANAL COMPANY, Appellee.**

No. 17393.

United States Court of Appeals
Fifth Circuit.

Nov. 30, 1959.

Woodrow de Castro, Balboa, Canal Zone, Michael E. Hanrahan, New York City, for appellant.

David J. Markun, Balboa Heights, Canal Zone, Paul A. Bentz, Gen. Counsel, Balboa Heights, Canal Zone, Theodore P. Daly, New York City, for appellee.

Before RIVES, JONES and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

Before stating his findings and conclusions of law in this case, the trial judge said to the proctors for the Panama Canal Company: "I know this is a question that will haunt you forever until you get this res ipsa out of your way." The question, important to the Panama Canal Company and to users of the Canal, is whether the doctrine of res ipsa loquitur applies based on the mere fact that a live [1] vessel, under the charge of a Panama Canal Company pilot, strikes the banks of the Canal.

The libelant did not plead nor attempt to prove any specific act of negligence on the part of the respondent. Instead, it relied on the doctrine of res ipsa loquitur as set forth in a previous decision of the district court, Louis Dreyfus & Cie v. Panama Canal Co., 1954 A.M.C. 652 (not reported elsewhere). The trial judge reaffirmed the views expressed in Dreyfus. He stated:

"[A] vessel which meets with an accident while transiting the Panama Canal with a Panama Canal Company Pilot in charge of navigation is sufficiently under the control

1. A live vessel is one proceeding wholly or in part under her own power.

of the respondent so that when the vessel establishes that it did not cause the accident, the respondent is called upon to explain its conduct. Absent a satisfactory explanation by the respondent, an inference of negligence may be drawn against it."

Although the Court found that the doctrine of res ipsa loquitur applied, "the showing made by the respondent was such that an inference that respondent was negligent would not be warranted under the evidence". Victorias Milling Co., Inc. v. Panama Canal Co., D.C.Canal Zone, 1955, 162 F.Supp. 185, 189.

We affirm the judgment for the respondent on the ground that the evidence shows no negligence on the part of the Canal pilot, but we think that the doctrine of res ipsa loquitur is generally inapplicable to allisions in the Canal and inapplicable in this case.

### I.

The libelant, Victorias Milling Company, is a Philippine corporation and is the owner of the M/V Nonsuco. The respondent, Panama Canal Company, is an agency and instrumentality of the United States government.[2] Its primary function is to maintain and operate the Panama Canal.

Federal regulations require vessels passing through the Canal to have a Panama Canal pilot aboard. 35 C.F.R. § 4.22 (1949). "The pilot assigned to a vessel shall have control of the navigation and movement of the vessel." 35 C.F.R. § 4.27 (1949). The Canal Company is liable for injuries to vessels caused by the negligence or fault of its officers or employees acting within the scope of their employment. 2 Canal Zone Code § 10(b), as amended 64 Stat. 1039.

The Nonsuco is a twin-screw motor-cargo vessel of Philippine registry. It has an over-all length of 439 feet, a beam of 56.1 feet, a gross tonnage of 5812, a net tonnage of 3084, and an authorized maximum mean draft of 26 feet, seven inches. It is not equipped with a rudder-angle indicator nor a revolution indicator. Thus, a pilot has no way of determining whether his orders to the engines and rudder are promptly and properly carried out.

Captain Fred Weade, the pilot assigned to take the Nonsuco through the Canal, first went to sea in 1929. He is a licensed master of ocean-going vessels. In August, 1954, at the time of the accident, he had been a Panama Canal Company pilot for almost five years and had been a master of tugs in the Panama Canal for almost seven years before becoming a pilot.

On the morning of August 15, 1954, the Nonsuco began a northbound transit of the Canal. The Nonsuco made the transit from Balboa, through Miraflores Locks, through Pedro Miguel Locks, and through the narrow Gaillard Cut without difficulty. The vessel handled satisfactorily. As the Nonsuco approached the Mamei Curve it was proceeding "full ahead", at seven or eight knots. The channel in Mamei Curve is approximately 700 to 800 feet wide, and the course followed by vessels coincides with the centerline of the channel. A northbound vessel must execute about a fifty degree turn to the right at the Mamei Curve. The pilot began the Nonsuco's turn at the customary point. In the Mamei Curve three small islands are located to the right of a northbound vessel. Some "bank suction" from the islands may be experienced by a vessel like the Nonsuco, but its effect is negligible and is lost as soon as the islands are passed. After the Nonsuco completed the turn from Mamei Curve into San Pablo Reach and was swinging slowly to the right, the pilot ordered the helmsman to check the swing and to steady on the northbound sailing line. The helmsman, in response to this order, applied left rudder. The swing to starboard was checked, but the

2. The Panama Canal Company was created by Act of Congress of June 29, 1948 (c. 706, sec. 2, 62 Stat. 1076; consisting of secs. 245 to 256 title 2, Canal Zone Code), as amended by the Act of September 26, 1950 (c. 1049, sec. 5 et seq., 64 Stat. 1041).

vessel commenced swinging slowly to port. The pilot ordered "steady" and then "half right" rudder. Ordinarily these rudder movements would have stopped the swing to port. The swing was not checked. The pilot then ordered "full astern" on the starboard engine. At this point the vessel was 1900 to 2000 feet from where it finally struck the side of the Canal. This was an adequate distance in which to stop the swing by use of the rudder. Usually a torque effect is produced on a twin screw vessel when the starboard engine is full astern and the port is full ahead, swinging the vessel's heading to the right. The master of the vessel, who had been in his cabin, appeared on the bridge almost immediately after the order, "full astern starboard engine", was given. The pilot told the master the engines were not responding. The pilot and the master went to the starboard wing of the bridge. There was no turbulence of water from the starboard propeller such as is usually present when an engine is reversed. They did not examine the water condition on the port side of the vessel. The master himself went to the bridge telegraph and rang "full astern" on the starboard engine three times. The sheer to port continued. The pilot then ordered "stop both engines", "drop both anchors", and "full astern on both engines" in rapid sequence. Approximately forty-five seconds to one minute elapsed between the time the pilot ordered "full astern starboard engine" and the time the pilot ordered the anchor dropped. Dropping the anchors checked the speed, but the vessel still struck the west bank at a speed of about two knots. The pilot and the master went to the steering room soon after the ship struck the bank and the rudder was "hard right", a position coinciding with the last rudder order given.

At the time of the accident, wind and current were negligible and visibility was good. Weather conditions did not contribute to the accident. The depth of the water was such that there was no appreciable "bottom-suction" to affect the vessel. The speed of the Nonsuco was well within the maximum allowable speed for this part of the Canal.

## II.

If Pollock, C.B.,[3] could have foreseen that the felicitous classic phrase, *res ipsa loquitur*,[4] would create such uncertainty and confusion,[5] both in its application and in its procedural effect, he would surely have sacrificed charm for more

---

3. In Byrne v. Boadle, 1863, 2 H. & C. 722, 159 Eng.Rep. 299.

4. One of the statements of the doctrine most frequently quoted is that of Chief Justice Erle in Scott v. London & St. Katherine Docks, Co., 1865, 3 H. & C. 596:

 "There must be reasonable evidence of negligence; but where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

 "Dean Wigmore has suggested three requirements for the application of res ipsa loquitur, which have been more or less uniformly accepted." (Prosser, the Procedural Effect of Res Ipsa Loquitur, 20 Minn.L.Rev. 241, 242 (1936)):

 "(1) The apparatus must be such that in the ordinary instance no injurious operation is to be expected unless from a careless construction, inspection, or user;

 "(2) Both inspection and user must have been at the time of the injury in the control of the party charged;

 "(3) The injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured."

 Some courts have added a fourth condition of dubious validity that evidence as to the true explanation of the accident must be more readily accessible to the defendant than to the plaintiff. See 2 Fowler and Harper, The Law of Torts (1956), § 19.5; Prosser on Torts (1955), p. 201.

5. Res ipsa loquitur "has been the source of so much trouble to the courts that the use of the phrase itself has become a definite obstacle to any clear thought, and it might be better to be discarded entirely". Prosser on Torts (1955), p. 201.

prosaic legal language. In this case we are concerned directly only with the application of res ipsa loquitur, unless it can be said that the application of the doctrine is inextricably tied in with whether its effect is to create a hard presumption or a soft inference or something in between.

■ The scope of the rule of res ipsa loquitur is set forth in Sweeney v. Erving, 1913, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815, a "decision which cut through the mass of verbiage built up around the doctrine of res ipsa loquitur".[6] Jesionowski v. Boston & M. R. Co., 1947, 329 U.S. 452, 67 S.Ct. 401, 404, 91 L.Ed. 416. The rule applied in these two cases "means that '[the] facts of the occurrence warrant the inference of negligence, not that they compel such an inference' * * * [The doctrine] deals only with permissible inferences from unexplained events". Johnson v. United States, 1948, 333 U.S. 46, 48–49, 68 S.Ct. 391, 393, 92 L.Ed. 468.

Dreyfus & Cie v. Panama Canal Company, 1954 AMC 652 (not reported elsewhere), furnished the rationale for the district court's views in this case. Because of the Dreyfus holding, the libelants in the instant case did not allege any specific act of negligence on the part of the Panama Canal Company. On the respondent's exception of no cause of action in the Dreyfus case the district court held first that the pleadings were insufficient in failing to show that the respondent had exclusive control of the offending instrumentality, the vessel. On rehearing, the district court reversed itself, quoting the oft-quoted rule laid down in Sweeney v. Erving [7] and relying strongly on Jesionowski [8] and a note in 33 Cal. L.Rev. 333 (1945).[9]

In Dreyfus the Court reasoned that striking a bank of the Canal was an extraordinary occurrence analogous to the derailment of a railroad car; that res ipsa loquitur is available even though there is divided control, if the libelant can prove itself free of fault; and, that "right of control", not necessarily actual control, allows an "inference of negligence to be created against persons who are responsible for the operation of the instrument". The court stated:

"Hundreds of ships transit the Panama Canal every month without mishap and certainly it cannot be said that the bumping of the bank in the Panama Canal by a ship is 'usual' and it must be held to fit within the definition of 'extraordinary.' The Panama Canal is completely under the control of the respondent and although there may be tides, fogs, winds and other physical manifestations that may cause accidents that are not due to the negligence of the respondent it may be that failure to make proper allowance for these natural occurrences amounts to negligence for the respondent is the only one in a position to know completely concerning them and thus the occurrence of the acci-

6. But see Shain, Res Ipsa Loquitur—Prescription and Burden of Proof (1945), especially at pp. 68–69, 182–215.

7. The court in Sweeney v. Erving, 228 U.S. 233, 33 S.Ct. 416, 418, 57 L.Ed. 815, stated that "res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; * * * that they make a case to be decided by a jury, not that they forestall the verdict."

8. The Court quoted from Jesionowski: "Derailments are extraordinary, not usual happenings. When they do occur, a jury may fairly find that they occurred as a result of negligence."

9. "The use of the term 'exclusive control' in many cases has been superseded by the phrase 'right of control,' which means that the instrument causing the damage need not be in the physical control of the defendant, but rather may be within the management and power to control of the defendant." 33 Cal.L.Rev. 333 (1945).

dent creates the inference that respondent is at fault." Dreyfus & Cie v. Panama Canal Company, 1954 AMC 652, 656.

Sweeney v. Erving, relied on by the Court, is a leading case on the effect of res ipsa loquitur as creating a permissible inference, but it is of little or no assistance in determining when the doctrine should be applied.

Jesionowski was an action by a widow under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. for her husband's death caused by the derailment of the defendant's railroad car. There was some evidence tending to show that the accident might have been caused by the decedent's improper signaling or by his throwing a switch. These however were the only activities within the possible control of the decedent; the railroad had exclusive control of all of the other factors that could have caused the accident. The physical operation of a railroad is susceptible of such control that it is safe to infer that a railroad car does not jump the track without negligence on the part of the railroad company. But the safe transit of a ship through the Panama Canal is not as simple as keeping a train on railroad tracks. The instrumentality involved, the ship, is the instrumentality of the injured party. In a ship's transit through the Canal the major elements of control—actual control—over the possible causes of accidents are in the shipowner, owning the ship and its complicated machinery and operating the ship

through officers and crew having divided responsibilities. The amount of actual control exercised by the pilot is limited by the efficiency and cooperation of the ship's personnel.

In Jesionowski the Supreme Court was concerned primarily that res ipsa loquitur should not be applied in such a way as to "bar juries from drawing an inference of negligence on account of unusual accidents in all operations where the injured person had himself participated in the operations, even though it was proved that his operations of the things under his control did not cause the accident". 329 U.S. 452, 457, 67 S.Ct. 401, 404. That principle should not be extended to relieve a libelant of the burden of alleging and proving his case when he is actually in control of more of the possible causes of the accident than the respondent.

Turning now to admiralty cases, we find that there are a number of cases in which res ipsa loquitur has been applied when a dumb tow strikes a stationary object. See, e. g., The Anaconda, 4 Cir., 1947, 164 F.2d 224; The Marian, 9 Cir., 1933, 66 F.2d 354, certiorari denied, Duncanson-Harrelson Co. v. Davidson, 290 U.S. 687, 54 S.Ct. 123, 78 L.Ed. 592; The Australia, 6 Cir., 1903, 120 F. 220; Sanders v. Meyerstein, D.C.E.D. N.C.1954, 124 F.Supp. 77; Texas Co. v. Lea River Lines, D.C.Del.1952, 109 F. Supp. 266, reversed on other grounds, 3 Cir., 206 F.2d 55; The Kite, (1933) Law Reports 154 (Probate).[10] In towage

---

10. The Anaconda, while proceeding under tow through a 500 foot channel, was grounded by its tug, and the court applied res ipsa loquitur because the accident would not have ordinarily occurred had the proper care been exercised. The damaged vessel was a barge, without engines, and was under complete control of its tug. In the Marian case, the third or last barge being towed by a tug collided with an anchored drilling rig. The court held that the burden of proof to show absence of negligence was on the moving vessel, the tug. In the Australia there was a collision between two barges, both of which were being towed by steam-

ers. The court did not speak of res ipsa loquitur, but a presumption of negligence was raised against the Australia. The reported decision does not make it clear whether the Australia was completely in tow or proceeding partly under its own power. Nevertheless, it was being piloted by its own master and was in the tow of a tug steamer when the collision occurred. In the Sanders case the tug ran on a shoal, the barge's momentum carried it by the tug and snapped the towing hawser, and the barge ran aground. The court said, "In a case such as this, where the towed vessel is unmanned, the tower is clearly and solely responsible for the safe

cases, however, the ship is not using its own power and is under the complete control of the tug.

There are also cases where res ipsa loquitur is invoked when a ship is in tow but is partly under its own power and in charge of a pilot. See, e. g. The Severance, 4 Cir., 1945, 152 F.2d 916, certiorari denied Stone v. Diamond S. S. Transp. Corp., 328 U.S. 853, 66 S.Ct. 1344, 90 L.Ed. 1626; People of State of California v. The Jules Fribourg, D.C. N.D.Cal.1956, 140 F.Supp. 333; Wilson v. Pilots' Association, D.C.E.D.S.C.1893, 55 F. 1000.[11] In this line of cases control seems to mean actual control of the factors around which negligence was probably centered.[12] It does not mean mere right to control.

There is a paucity of cases in which res ipsa loquitur is applied to a situation where the vessel is proceeding completely under its own power but with a pilot who is not a member of the ship's crew. Seaboard Airline R. Co. v. Pan American Petroleum & Transport Co., 5 Cir., 1952, 199 F.2d 761, certiorari denied, 345 U.S. 909, 73 S.Ct. 649, 97 L.Ed. 1344, involved a vessel proceeding under its own power but in complete charge of a river pilot. The ship struck a bridge on the Savannah River. Although there is some language which indirectly implies that a presumption is raised against the pilot, this Court did not speak in terms of res ipsa loquitur. The libel was against the vessel and its owner. Specific acts of negligence were alleged in the libel. The Court found the pilot was negligent in the manner in which he approached the bridge and in ordering full speed ahead. Compagnie Generale Transatlantique v. Tawes, 5 Cir., 1940, 111 F.2d 92, certiorari denied, 311 U.S. 678, 61 S.Ct. 46, 85 L.Ed. 437, involved a fact situation very similar to case at bar. A steam vessel while transiting the Panama Canal in charge of a compulsory pilot struck the right bank of the Canal in the Mamei turn. An action at law was brought against the pilot. Specific acts of negligence were alleged. This Court found that due to the presence of fog during the crossing the pilot was not negligent. Although the facts of the case are almost identical to those at bar there was

navigation of the tug and tow." [124 F. Supp. 82] The Texas Co. case involved a barge in tow of a tug. The tug allowed the barge to scrape the concrete wall of a canal at Lockport, Illinois, and a presumption of negligence was raised against the tug. The Kit, an English case, involved a tug towing a "dumb barge".

11. The steamship Severance was being towed by a tug and piloted by the master of the tug. The pilot was in complete command of the ship. It took a sudden sheer to port and struck a bridge piling. The Fourth Circuit held that there was a presumption of negligence on the part of the pilot that called for a reasonable explanation. The pilot however was relying on a tug to tow the Severance, and the tug proved inadequate to do the job. In the Fribourg case the tug captain had boarded the Jules Fribourg to act as pilot. The vessel was proceeding under her own power but was assisted by a tug. The court did not speak in terms of res ipsa loquitur or presumptions, but held that the pilot was negligent in attempting to dock the vessel with only one tug. The Wilson case involved a schooner in charge of a Charleston Harbor pilot

and being towed by a tug. The libelant alleged that the schooner was grounded because of the negligence of the pilot and the contributory negligence of the tug. The court held this pleading was sufficient and that the libel need not allege specific acts of negligence. The case was heard on its merits, and the libel against the pilot and the Charleston Pilots' Association was dismissed. The damaged vessel was proceeding out of the harbor under tow, but the Charleston River Pilot was on the tug instead of the schooner. Pilotage was compulsory. The court did not speak of res ipsa loquitur, but wrote, "This is not a case in which the fact of the accident is conclusive of the cause." The libel was dismissed because the master of the vessel, who was at the helm, was negligent. 57 F. 227, 232.

12. In The Severance, for example, the court found that the cause of the accident was a freshet, a condition of the river, which the navigator knew or should have known. Another basis for the finding of negligence was that the tug was not competent, too small, for the proposed undertaking.

no discussion of res ipsa loquitur or presumptions in the case. Matheson v. Norfolk & North America Steam Shipping Co., 9 Cir., 1934, 73 F.2d 177, involved an action by the owner of the vessel against a Columbia River Pilot. The vessel was proceeding under its own power but in charge of a pilot. While attempting to dock the vessel at Astoria, Oregon, the pilot grounded the vessel on a sand bank. The court, quoting from Louis-Dreyfus v. Paterson Steamships, 2 Cir., 1930, 43 F.2d 824, 826, 72 A.L.R. 242, said "we must infer fault unless good proof exculpates the navigator." However, there were specific allegations of negligence in the libel, and the trial court found the pilot was negligent in five particulars.

As far as we can discover, no appellate court has applied the doctrine of res ipsa loquitur to a fact situation such as the one here presented. We can discern no underlying policy requiring a departure from the theory of fault, in favor of shipowners or cargo owners using the Panama Canal. Further, Congress has stated in the Canal Zone Code that in order to recover for injuries to vessels in "waters of the Canal Zone, other than the locks" of the Canal the libelant must show that "the injury was proximately caused by negligence or fault" of the Company.

Section 10(a) of Title 2, as amended by the Act of September 26, 1950 provides:

"(a) Injuries in Locks of Canal. —The Panama Canal Company shall promptly adjust and pay damages for injuries to vessels, or to the cargo, crew, or passengers of vessels, which may arise by reason of the passage of such vessels through the locks of the Panama Canal under the control of officers or employees of the said corporation: * * * from the time the first towing line is made fast on board before entrance into the locks and until the towing lines are cast off upon, or immediately

prior to, departure from the lock chamber."

Section 10(b) recognizes the difference in the control exercised when a vessel is in locks and when a vessel is outside of locks. This section reads:

"(b) Injuries Other Than in Locks.—The Panama Canal Company shall promptly adjust and pay damages for injuries to vessels, or to the cargo, crew, or passengers of vessels which may arise by reason of the presence of such vessels in the waters of the Canal Zone, other than the locks, when the injury was proximately caused by negligence or fault on the part of any officer or employee of the corporation acting within the scope of his employment and in the line of his duties in connection with the operation of the Canal: * * *."

For Congress, therefore, the control a pilot exercises when a ship is *live* is not sufficient to justify the inference or presumption of negligence that arises when a vessel is under the actual control of Canal personnel using towing lines.

 The doctrine of res ipsa loquitur should not be employed for the purpose of creating an inference of negligence when circumstances do not warrant such an inference. "[I]n the situation to which res ipsa loquitur as a distinctive rule applies, there is no evidence, circumstantial or otherwise, at least none of sufficient probative value, to show negligence, apart from the postulate—which rests on common experience and not on the specific circumstances of the instant case—that physical causes of the kind which produced the accident in question do not ordinarily exist in the absence of negligence."[13]

It seems to us that the district court placed too much reliance on the infrequency of canal strikings. The court was impressed with the fact that from July 1, 1941 to August 16, 1954 there were only 56 groundings or bank-strik-

---

13. Annotations, 141 A.L.R. 1016 (1942), 78 A.L.R. 731 (1932), 59 A.L.R. 468, 470 (1929).

ings out of 87,210 transits of the Canal by ocean-going vessels. An examination of the causes of the 56 allisions reveals that only eight were attributable to failure of personnel of the Panama Canal Company. Thirty-four accidents were attributable to failure of the ship's equipment; five were attributable to the ship's personnel; five were deemed unavoidable accidents; three resulted from combined failures of personnel and equipment; and the cause of one accident was undetermined.[14] On the basis of experience therefore, it could hardly be said that "the circumstances are such as to justify the inference that if the event occurs, it would not ordinarily happen unless the actor was negligent". Ozark v. Wichita Manor, 5 Cir., 1958, 252 F. 2d 671, 674, rehearing denied 258 F.2d 805. If we balance the probabilities in this case, as checked by the statistical record of Canal allisions,[15] we would have to say that the inference to be drawn from the occurrence of the accident is that the striking was *not* caused by pilot error.

Some of the possible causes other than pilot error in this type of fact situation are indicated in the record. Thus, the bell reports indicate the possibility that the engine room personnel did not respond immediately to the pilot's orders; the non-turbulence of water around the starboard propeller of the vessel implies that the starboard engine was not put full astern as ordered by both the pilot and the master; the steering mechanism will not function properly if the fireman allowed the steam pressure to decrease; if an engineer turns the wrong valve, thus temporarily cutting off the air pressure or temporarily lowering the steam pressure, it would be impossible to reverse the engines as the pilot ordered. The trial judge found that "the possible reasons for temporary rudder

14. These figures are taken from the record (summary-abstracts of the opinions of the Board of Local Inspectors) of transits, accidents and causes of accidents prepared by the Recorder of the Board of Local Inspectors covering the period July 1, 1941 to August 16, 1954. The opinions of the Board of Local Inspectors of the Canal Zone Government provide the sole extensive body of expert, evaluated experience with vessel-accidents in the Panama Canal. The function of the Board of Local Inspectors, in determining the causes of bank-strikings and groundings in the Panama Canal, is exercised pursuant to legal mandate. See section 9 of title 2 of the Canal Zone Code enacted by Act June 19, 1934, c. 667, 48 Stat. 1122, which is the source of the broad authority of the President of the United States to regulate navigation in the Panama Canal; see Rule 155 of Executive Order 4314 expressly authorizing the Governor of the Canal Zone to create a Board of Local Inspectors, see 35 C.F.R. § 12.2 and § 12.6 wherein the Board of Local Inspectors is created by the Governor of the Canal Zone and is charged by him with the duty of investigating, inter alia, marine accidents of a serious character occurring in the Canal Zone, and fixing responsibility therefor; and see 35 C.F.R. § 12.8 and § 12.10 requiring the Board to report the results of its investigations to the Governor and laying all official records of the Board open to public inspection. The Board of Local Inspectors as an investigatory body has received legislative recognition in section 10(g) of title 2 of the Canal Zone Code, wherein such investigation is made a prerequisite to suit under said section. Graham v. Panama Canal Company, D.C. Canal Zone, 139 F.Supp. 271, 1956 A.M.C. 212. See The Abangarez, D.C.E.D.La. 1932, 60 F.2d 543, holding that the opinions of the Board of Local Inspectors of the Canal Zone Government are admissible as official records. The "Report of Governor of the Panama Canal, Appendix 10, under Public Law 280, 79th Congress, 1st Session," at page 118 et seq., which includes a study of vessel-accidents over a more extended and somewhat overlapping period of time, also supports the view that no reasonable inference of appellee's negligence can be drawn from the mere fact of a vessel accident occurring in the Panama Canal. More than 10 percent of the bank-strikings and groundings in the Panama Canal during the period July 1, 1941 to August 16, 1954 were either "unavoidable" or "unexplained." The majority of accidents were caused by fault of the vessel or its personnel.

15. See Note, The Use of Expert Evidence in Res Ipsa Loquitur Cases, 106 U. of Penn.L.Rev. 731 (1958).

failure or failure to bring the starboard engine from 'full ahead' to 'full astern' are many and varied".

In the usual case of a bank-striking in the Panama Canal, therefore, the allision may result from the negligence of the Canal Company or from the negligence of the libelant or without the negligence of either. In this situation there is no more reason to apply res ipsa loquitur than there would be to apply it in an automobile collision when the plaintiff alleges that he is free from fault and makes out a prima facie case showing no fault on his part.

■ We do not say res ipsa loquitur is never applicable to a Canal bank-striking. For example, when an injury occurs while a vessel is in the locks of the Canal or when a vessel in the tow of two tugs strikes the side of the Canal, the vessel is so completely under the control of the tugs that it is reasonable to infer negligence. We simply hold that the doctrine of res ipsa loquitur is not available to the libelant in the general fact situation presented in this case.

### III.

■ On the record as we read it, the libelant failed to prove his case.

A. It is an important fact that the ship did not have a rudder angle indicator nor a revolutions indicator. The pilot therefore had no way of knowing whether his orders were carried out properly and promptly. The libelant did not produce any witnesses from the engineering department of the vessel. No authenticated engine room records were produced. An examination of all the testimony reveals discrepancies concerning the bell signals from the bridge to the engine room, and the bridge bell book is of no help since it does not differentiate between signals concerning the starboard engine or the port engine. The book was unsigned and there were discrepancies between the notations in it and the orders which the pilot testified he gave. There was no engine room bell book kept, or if one was kept, it was not produced at the trial, though called for

by the respondent. The libelant produced a photostatic copy of one page from the chief engineer's log book. It contained a neat column of bell entries, all apparently executed by the same person. A record of bells is not customarily kept in a chief engineer's log book. These entries were under columnar headings calling for water temperature, pressures, engine revolutions, etc.; they were not made contemporaneously with the receipt of bells on the engine room telegraph. In addition, there was a discrepancy between the notations of bell signals received and the orders given by the pilot. Both the pilot and the third mate, who testified at the Board hearing but not at the trial, stated that the order "full astern starboard engine" was given before the order "full astern port engine". The entries in the chief engineer's log book showed the receipt of these two orders simultaneously. The pilot and the master went to the starboard side of the vessel after the order "full astern starboard engine" was given, and the usual turbulence of water that accompanies an engine's reversal was not present.

We are not impressed by the libelant's argument that the pilot did not criticize the personnel of the vessel when he testified before the Board. The pilot was in no position to criticize the actions of the engine room personnel. He could not observe their actions and there was no rudder angle indicator or engine revolution indicator to inform him exactly what was happening in the engine room.

B. The respondents established that the pilot, a seasoned man, acted with due care in performing all his duties. The speed at which he was proceeding at the time of the accident was well within the allowable limit for the Canal. The pilot approached the turn into the San Pablo Reach in a proper manner. He was where he belonged in the channel. He did not pilot the boat close enough to the islands to experience any noticeable "bank suction". He corrected the sheer to starboard by the proper procedure. When the port sheer resulted,

he gave orders that under usual conditions would have corrected this sheer and avoided the collision. In short, he did all that a reasonable, prudent pilot would do in these circumstances. The captain of the ship, a master with fifteen years experience on the vessel, testified that all the orders which the pilot gave were correct.

Whether or not this opinion finally lays to rest the ghost haunting the Panama Canal Company, we hold that there is substantial evidence to sustain the trial judge's conclusion that the accident was caused by a failure of the Nonsuco's personnel to execute the pilot's orders promptly and properly.

The judgment is
Affirmed.