**LOUIS DREYFUS & CIE.**, as owner of THE Steamship CHARLES, L.D., her engines, boilers, etc., Libelant,

v.

**PANAMA CANAL COMPANY**, a corporation, Respondent.

No. 3665.

District Court, Canal Zone,
Division Balboa.

Feb. 2, 1960.

Hill, Betts & Nash, New York City, and De Castro & Robles, Balboa, Canal Zone, for libelant.

Bentz, Markun, Cooper & Daly, Balboa Heights, Canal Zone, for respondent.

GUTHRIE F. CROWE, District Judge.

### Statement of Facts

This is an action in admiralty instituted by Louis Dreyfus & Cie., a French partnership, owner of the motor vessel Charles L.D., against the Panama Canal Company for the recovery of damages allegedly sustained by the libelant as the result of a striking of the banks of the Panama Canal while the vessel was transiting the Canal with a pilot employed by the respondent.

On December 27, 1951, the Charles L.D. arrived at the Pacific end of the Panama Canal under command of Captain Georges Piquet, holder of an unlimited master's license of merchant vessels issued by the French Government. The vessel was bound from Vancouver, B.C., to London with a cargo of wheat and she began the northbound transit of the Canal at about noon on the date of arrival after taking on board Captain R. G. Rennie, Panama Canal Pilot, who thereafter was in control of the navigation and movements of the vessel as provided by Federal Regulations (35 CFR 4.27).

On coming to anchor at Balboa it was necessary to "walk out" the starboard anchor and it was reported by Captain Piquet to Captain Rennie that the anchors could not be dropped unless they were "walked out." Captain Rennie therefore suggested that a tug be used in the transit, which was agreed to by Captain Piquet, and the tug Trinidad with Captain Robert L. Jordan in charge was assigned the chore.

The Charles L.D. proceeded from Balboa through the Canal, beginning at about 11:45, and met the tug just before entering the first set of locks known as the Miraflores Locks.

The transit proceeded in a normal manner through the first locks, then across Miraflores Lake and through the second set of locks at Pedro Miguel.

At Pedro Miguel news was received that the Gaillard Cut was temporarily closed because of an accident to another vessel and the Charles L.D. tied up at the locks until about 7:30 p.m. when the Pilot received word to continue the transit.

The tug Trinidad was made fast to the Charles L.D. ahead on a hawser of approximately 250 feet and the two vessels proceeded from Pedro Miguel in a northerly direction through the Canal.

At the junction of Empire and Las Cascadas Reaches some difficulty was experienced in making the turn and in Bas Obispo Reach the Charles L.D. suddenly took a "dive" to the port touching the West Bank of the Canal lightly near station 1545 and then she sheered to starboard striking the East Bank of the Canal heavily near station 1515.

These events occur in confined waters and frequently the experts and triers of facts are confounded and find it most difficult to determine the true cause of the vessel's actions.

As written by Major General Glen E. Edgerton, U.S.A. (Ret.), former Governor of the Canal Zone at Panama and later only American member of a board of experts appointed to advise on the maintenance and improvement of the

Suez Canal, in an article appearing in the January 1957 edition of "The National Geographic Magazine,"

"From the standpoint of the master accustomed to straight steaming in deep water, the most unnerving thing about a Suez transit is the sudden seeming insanity of his ship.

"'The old gal forgets all she's ever learned,' one master of a huge tanker told me. 'She acts like a colt in a pasture. She's a different baby entirely.'

"The reason is the peculiar action of water confined between narrow banks. True, this sort of thing can occur in a dredged channel in a shallow bay or in any narrow canal."

The vessel received considerable damage but the Court does not concern itself with damages at the time of this opinion as the question of liability is being first determined by agreement of the parties.

On December 8, 1952, Louis Dreyfus & Cie., owner of the Charles L.D., instituted the action against the respondent, Panama Canal Company, under subsection 10(b) of Title 2 of the Canal Zone Code, as amended, alleging specific negligence and also entitlement to recovery on the basis of the doctrine of *res ipsa loquitur*.

This Court at first upheld respondent's position as raised by exceptions to the libel that the doctrine was not applicable because the operation of a ship, even though under the control of respondent's pilot as to navigation and movements of the vessel, did not present a condition of such exclusivity of control and knowledge that would warrant its application.

Upon reargument, however, the Court reversed its view and held that as the right of control was vested in the respondent's pilot by Federal Regulation and that libelant was forced to entrust its vessel to the control of respondent before having the right to transit the Canal that it was reasonable to assume that in the event of accident and proof by libelant that the vessel and libelant's employees were not negligent and did not cause the accident that a rebuttable inference of negligence may be drawn and the respondent required to explain.

The Court of Appeals for the Fifth Circuit has ruled, however, in two cases recently heard on appeal from this court that "the doctrine of *res ipsa loquitur* is generally inapplicable to allisions in the Canal" and inapplicable in those two cases which are quite similar to the case at bar which, in the mind of this Court, has no special features that would cause the doctrine to be applicable here when not applicable in those cases. It is, therefore, held that the doctrine is inapplicable and this decision supporting the position of the respondent and denying liability is rendered on the allegation of specific negligence. See Victorias Milling Co., Inc., v. Panama Canal Company, 5 Cir., 272 F.2d 716, and Panama Canal Company v. Sociedad De Transportes Maritimos, 5 Cir., 272 F.2d 726.

Findings of Fact

1. The MS Charles L.D. is a single-screw motor ship of French registry, 6480 gross tons, 3502 net tons, 465.8 feet registered length, 502 feet overall length, 59 feet beam with an authorized tropical freshwater draft of 25 feet. The vessel's actual draft in the tropical fresh water of the Panama Canal on the day of the accident was 24' 7" forward and 24' 11" aft. At the time of the accident the vessel was owned and operated by Louis Dreyfus & Cie., Paris, France, and was northbound in the Panama Canal on a voyage from Vancouver, B.C., to London.

2. The respondent, Panama Canal Company, is a corporation duly organized and existing under the laws of the United States of America and wholly owned by that country. It was especially organized and created for the maintenance and operation of the Panama Canal and has the corporate power to sue and be sued as conferred upon it by act of Congress.

3. The Charles L.D. arrived at Balboa at about 9:20 a.m. on December 27,

1951, laden with a cargo of wheat and came to anchor with her port anchor awaiting the assignment of a compulsory Panama Canal Pilot, as required by Title 35, Code of Federal Regulations, Section 4.22, as adopted by Order of the Secretary of the Army, Canal Zone Order 20, January 6, 1953, 18 FR 280.

4. Upon the vessel's arrival at Balboa and during her northbound transit of the Canal her trim was normal and her draft proper and she was not overloaded.

No difficulties had been encountered with her engines and steering gear during the passage from Vancouver to Balboa, and while awaiting the pilot a test of the steering gear and rudder was conducted and they were found to be operating properly.

5. Captain Robert Gillis Rennie, Panama Canal Pilot, was assigned to pilot the vessel northbound through the Panama Canal. At the time of the accident he had sea experience dating back to 1917. He had served three years in the U. S. Navy in World War I. After his service with the U. S. Navy he had served on Grace Line vessels as third mate, second mate, first mate, and finally as master. His master's license was issued in 1924 and he had served as master for one year and seven months on various vessels, including one motorship. In November of 1936 Pilot Rennie joined the Panama Canal Company and, after the usual period of training, which included a period of service on Panama Canal Company towboats, he was issued a Panama Canal Pilot's license in 1939. Prior to the day of the accident, December 27, 1951, he had conned more than 1,800 vessels through the Panama Canal, many of them motor vessels. Pilot Rennie was fully qualified to pilot the Charles L.D. through the Canal and was in all respects a competent Panama Canal Pilot.

6. The master of the assisting tug Trinidad, Captain Robert L. Jordan, was an experienced, competent, and properly licensed towboat master. He first went to sea in 1919 aboard U. S. Naval vessels where he attained the rate of chief radioman. In 1929 he was employed by the Panama Canal Company as radioman in towboats and in 1939 was appointed as master of towboats. From 1942 to 1943, he served as master of towboats for the U. S. Army in Canal Zone waters. Upon completion of his service with the U. S. Army, he returned to the employment of the Panama Canal Company where he remained until his resignation in 1952. Captain Jordan was fully qualified to command the tug Trinidad in assisting the Charles L.D. through the Panama Canal and was in all respects a competent Panama Canal towboat master.

7. The Charles L.D. was equipped with a rudder angle indicator. However, on the night of the accident the rudder angle indicator was not illuminated, although it was of the type that could be illuminated, and the Pilot had requested that it be illuminated. Apparently, the illuminating feature was not operative. It was necessary for Pilot Rennie from time to time to use his flashlight in order to ascertain the position of the rudder angle indicator. The Charles L.D. was not equipped with an engine revolution indicator. The Pilot had no means of directly informing himself of the rate or direction of the engine's motion.

8. On December 27, 1951, Pilot Rennie boarded the Charles L.D. in the Pacific approach to the Panama Canal for the northbound transit. He proceeded to the bridge of the vessel where he encountered the Master, Captain Piquet, and the mate on watch and the quartermaster. He made the routine observations of the equipment on the bridge, including the engine telegraph, which indicated four speeds ahead, i.e., "dead slow," "slow," "half" and "full." The Master informed Pilot Rennie that at "dead slow" the vessel would move at about 5½ knots, "slow" 6 to 7 knots, "half" 8 knots, and "full" 13 or 14 knots. Pilot Rennie was informed by the Master that the vessel could not let go her anchors except by "walking" them out, i. e., they would not fall free on the release of the brake but would have to be lowered by

turning the windlasses. The Master did not inform Pilot Rennie of the exact nature or cause of the difficulty with either anchor prior to its arrival at the Panama Canal nor did the vessel experience any difficulty with either anchor while the vessel was in the Canal, nor subsequent to the date of the accident while Captain Piquet was Master of the Charles L.D. Pilot Rennie obtained the assistance of a tug from the Panama Canal authorities as a safety precaution in the event that some emergency should develop in the course of the intended transit and in the event that the anchors would not drop. Pilot Rennie ordered the Master to have the anchors eased out of the hawsepipes while in the Gaillard Cut and to have the proper ship's personnel standing by at the anchors while approaching and leaving the locks and also while the vessel was in the Gaillard Cut. The transit proceeded in a normal manner with the vessel maneuvering under various bells to Miraflores Locks, across Miraflores Lake, and through the locks at Pedro Miguel. Pilot Rennie noted that the vessel handled as well as the average heavily laden "Liberty" ship but that she would not steer with the engines stopped, a characteristic of most motor vessels. Because of an accident involving another vessel in Gaillard Cut, the Charles L.D. was required to tie up to the east center wall at the north end of the locks and to await word that all was clear to proceed through Gaillard Cut. While tied up alongside the east center wall, Pilot Rennie ordered the towboat master on watch at the time to pay out a towing hawser of approximately 250 feet. The towing hawser was secured well forward on the stem of the Charles L.D. Prior to commencing the transit of the Cut, Pilot Rennie informed Captain Jordan that the reason the tug was being used was that difficulty was being experienced with the anchors. He further informed Captain Jordan to keep a fairly tight hawser, to keep in the middle of the channel, and that he would transmit any further orders by radio.

9. At about 7:20 p.m., at twilight, and after the Pilot had received word that the transit could be resumed, the Charles L.D. departed from Pedro Miguel Locks on a "dead slow ahead" bell with the tug Trinidad assisting ahead on the hawser. Standing by on the bow of the Charles L.D. watching the towing hawser were several Panama Canal seamen, including Mr. Lu Yun Sing and Mr. Felix Aleman. The vessel, which was proceeding at about 6 to 7 knots, experienced no difficulty during the transit of approximately the first five miles of the Cut, making all turns without difficulty. However, in making the turn at the junction of Empire and Las Cascadas Reaches, Pilot Rennie was forced to go from "dead slow ahead" to "slow ahead" in order to obtain sufficient rudder power on "hard right" wheel to make the turn. The vessel then proceeded normally for a short while when presently Pilot Rennie noticed that the quartermaster, who was using more than the normal amount of wheel, was experiencing considerable difficulty when ordered to "steady up" on the ranges. In order to abate the erratic action of the vessel, Pilot Rennie stopped the vessel's engines for several minutes to place added strain on the towing hawser. This maneuver, however, did not have the expected effect of "quieting" the vessel nor does the "stop" bell appear in the engine room bell book. Pilot Rennie then increased the speed to "slow ahead" and the vessel steadied satisfactorily on the range in Bas Obispo Reach. Bas Obispo Reach is the final reach in Gaillard Cut on a northbound transit. Suddenly, with the vessel "dead on the ranges" she took a quick "dive" to port, i. e., to the West Bank of the Canal. Several minutes prior to the "dive" to port the Master took the wheel from the helmsman, Kermorvant, who was in all respects a competent and experienced helmsman and who had been steering well up to that time, on seeing that difficulty was being experienced with the steering and upon hearing Kermorvant remark that "the rudder was no longer responding to the wheel."

While on the wheel the Master moved it to some unknown position or positions in order "to test its free movement." After the test the Master ordered the second mate, Matas, to take the wheel. The chief engineer arrived on the bridge while the second mate was at the wheel, i. e., within two or three minutes before the vessel struck the West Bank. The chief engineer then went aft to the steering engine room to inspect the steering gear prior to returning to the engine room. The wheelhouse was dark and Pilot Rennie was not informed or aware that such test was being made or that the chief engineer was on the bridge or that the helmsman, master and second mate were taking turns at the wheel. When the dive to port, i. e., the West Bank, commenced, Pilot Rennie at once ordered "hard starboard rudder" and "let go the starboard anchor." He also called the towboat master on the radio and told him to use full power in an attempt to break the sheer. The wheel of the Charles L.D. was moved hard to starboard as ordered. Because no member of the vessel's crew was on the bow manning the anchors, the starboard anchor was not dropped. The libelant did not produce at trial any of the personnel who should have been manning the anchors at the time. The vessel grazed the West Bank lightly at about 2016 or 2017 hours in the vicinity of station 1545 and then sheered to starboard, i. e., toward the East Bank. At the time the vessel grazed the West Bank, the tug was pulling under full power, attempting to break the sheer and attempting to return to the centerline of the channel. When Pilot Rennie saw that the vessel was coming out of the dive and away from the West Bank, he ordered "hard left rudder" to counter the suction created by the vessel's close approach to the West Bank. The vessel then proceeded about 500 feet (about on ship's length) with the stern being drawn in by bank suction on the port side. At this point Pilot Rennie directed his flashlight to the rudder angle indicator and, although the wheel was "hard left," he saw that the rudder angle indi-

cator showed only 15 degrees left rudder. He pointed the fact out to the Master. At this point the Master expressed the opinion that the rudder might have been damaged on the striking of the West Bank. After calling the Master's attention to the fact that the steering mechanism was not functioning properly and with the vessel still sheering to the right, Pilot Rennie, who was watching ahead to see if he could detect any change in the vessel's heading, noticed that the vessel's rate of swing to the right was increasing. He turned around and saw the Master in the act of moving the wheel to the left. Pilot Rennie had given no orders to the wheel from the time the vessel grazed the West Bank other than "hard left rudder." In an effort to increase the rudder force Pilot Rennie ordered the engines from "slow ahead" to "half ahead" after once again checking the rudder angle indicator. The indicator showed the rudder to be at 15 degrees. "Half ahead" was maintained for somewhat less than a minute. The vessel was holding her own but was not breaking the gradual sheer to the East Bank. Seeing that the sheer to the East Bank was not going to be broken, Pilot Rennie immediately ordered "emergency full astern" and "let go the anchors." About this time he also called the tug Trinidad again on the radio and told the towboat master to give full power in attempting to break the sheer to the East Bank. The towboat master replied that "he had her wide open." The "emergency full astern" order was given on the bridge telegraph in the form of a "jingle" by the Master. Shortly thereafter Pilot Rennie himself also executed a "jingle" on the bridge telegraph. No member of the vessel's crew was on the bow manning the anchors at the time the Pilot ordered the anchors let go. The port anchor was not dropped until about thirty seconds prior to the striking of the East Bank and only then because Mr. Sing, a Panama Canal Company seaman standing by the towing hawser on the bow, ran aft to summon the chief mate to his station on the foc'sle head. De-

spite the maneuvers ordered by Pilot Rennie, the vessel continued ahead striking the East Bank at about station 1515 at approximately 2020 hours at a speed of approximately 5 knots. After the vessel struck Pilot Rennie again pointed to the rudder angle indicator, as he had done on three occasions during the sheer to the East Bank, and showed the Master that, with the wheel hard left, the rudder angle indicator still showed only 15 degrees left. Pilot Rennie then went below with the Panama Canal Company's Port Captain of Cristobal who had boarded the vessel after the accident. When he returned to the bridge, engine department personnel had the telemotor disassembled with the parts on the deck. After the telemotor had been worked on in this manner, the rudder angle indicator followed the movement of the wheel and the rudder was used to work the vessel away from the bank. Once away from the bank the vessel was removed to Gamboa where Pilot Rennie was relieved. The use and inspection of the rudder after the second striking confirmed the fact that the rudder had not been touched or damaged in any way.

10. The actions taken by the Pilot prior to and susbequent to the steering gear failure were in all respects proper and in accordance with the practices of good piloting and seamanship.

11. The cause of the Charles L.D.'s sudden dive to the West Bank was either a failure of the vessel's steering mechanism or the result of the action of the Master or officer at the wheel placing the wheel, without orders from the Pilot, in a position tending to direct the vessel into the West Bank. Failure of the steering mechanism of the type of steering gear in question (electric-hydraulic), manifested by a divergence between wheel and rudder, could have been caused by leakage or loss of fluid in the hydraulic system of the telemotor, i. e., a leakage at the joints connecting the copper lines or at the packing in the equalizer valves, or by the constant working of the wheel causing loss of fluid through improperly seated safety valves. Lost fluid would not be replaced automatically but would have to be replaced manually by operation of the bypass lever. Most probably, the helmsman's remark that "the rudder was no longer responding to the wheel" was based on the failure of the movement of the wheel to induce the usual resistance felt when the wheel is acting against the fluid in a properly pressurized telemotor. This complaint led to an unwise "testing" of the wheel by the Master and a confusing shifting of personnel at the wheel in a darkened wheelhouse. One of the three (helmsman, Master or second officer) apparently held the wheel in a position tending to send the vessel into the West Bank until the Pilot gave the order "hard right."

12. The Master executed unordered helm movements immediately prior to the grazing of the West Bank by the vessel and also immediately prior to the striking of the East Bank by the vessel.

13. There was a failure of the vessel to comply with the orders of the Pilot to man the anchors while the vessel was transiting the Gaillard Cut. As the result of said failure, the starboard anchor was not dropped at all as ordered by the Pilot on the sheer to the West Bank and the port anchor was not dropped until about thirty seconds prior to the vessel's striking the East Bank on the second sheer. The prompt dropping of the anchors, as ordered by the Pilot, would have been of material assistance to the Pilot in reducing the vessel's speed and may have resulted in avoiding the striking of the East Bank.

14. The chief engineer was absent from his post in the engine room (in violation of 35 CFR 4.32) when the Pilot ordered "emergency full astern" on seeing that the sheer to starboard, i. e., to the East Bank, was not going to be broken. His absence resulted in the lack of proper supervision over his subordinates who were at the engine controls and who, not knowing the significance of a "jingle" on a "full astern" bell, did not execute the "emergency full astern" as ordered by the Pilot but who, in their

confusion, executed a "full ahead" bell for a substantial portion of the time that the "emergency full astern" was ordered. Also, the watch being maintained by the engine department of the Charles L.D. at the time of the accident was generally inadequate inasmuch as no person was assigned to the duties of checking the auxiliary machinery (in particular, the air compressor) to assure that it was operating properly. The proper operation of the auxiliary machinery is necessary for the proper operation of the vessel's propulsion machinery.

15. The tug Trinidad is a 750 horsepower diesel electric tug of 120 feet overall length, 24 foot beam and draft of 11 foot forward and 13 foot aft. Her engines are directly controlled from the pilothouse. The tug Trinidad was in all respects adequate for the purpose for which it was used.

16. The hawser between the tug Trinidad and the Charles L.D. was approximately 250 feet in length. The length of the hawser used by Pilot Rennie was in accordance with the established piloting and towing practices in the Panama Canal for the given size of the vessel.

17. The use of the tug Trinidad in placing her ahead on a single hawser approximately 250 feet in length to assist the Charles L.D. through the Gaillard Cut was in accordance with the established practices of piloting and giving towing assistance to "live" vessels, i. e., vessels which have the use of their engines and rudder, in the Panama Canal. The actions taken by the towboat master at all times while assisting the Charles L.D. were in all respects proper and in accordance with good towing practices and seamanship.

18. The use of a tug ahead on a hawser to assist a "live" vessel in Gaillard Cut was at least as effective as the use of a tug alongside the vessel, and it is clearly the safer method. Pilots are prohibited by administrative regulations of the Panama Canal Company from using a tug alongside a "live" vessel in Gaillard Cut.

19. Chief Engineer Liebermann, who was in charge of the engine room of the Trinidad at the time of the accident, was an experienced and competent chief engineer. The action taken by him prior to and subsequent to the steering gear failure was in all respects proper.

20. The depth of water under the Charles L.D. in Bas Obispo Reach was such that there was no appreciable "bottom-suction" or hydraulic interaction between the hull and the bottom contour of the channel.

21. The transit was made on a clear night with good visibility. The fact that the transit was made at night had no bearing on the accident.

22. At the time and place of the accident, wind and current were negligible. "Surge" or "seiche" created by the drawing of water at Pedro Miguel Locks has not been established to be a causative factor in the accident although there is evidence that it could have been present and could have had some effect in causing the vessel to sheer had it been present in sufficient force and "range."

### Conclusions of Law

1. This is a suit by the owner of the MS Charles L.D. under subsection 10(b) of title 2 of the Canal Zone Code, as amended, as added by section 3 of the Act of September 26, 1950, Chapter 1049, 64 Stat. 1038, for damages sustained by the vessel when she struck the West and East Banks of the Panama Canal in Bas Obispo Reach on December 27, 1951, while being navigated by a Panama Canal Pilot. Under subsection 10(b) of title 2 of the Canal Zone Code, as amended, the respondent is liable for injuries which a vessel sustains by reason of the negligence or fault of the respondent or its officers, agents, or employees acting within the scope of their employment and in the line of their duties in connection with the operation of the Canal.

2. The evidence establishes that every aspect of the control which respondent had over the vessel was exercised with due care both prior to and during the sheer which resulted in the bank

strikings. The bank strikings were not caused by any fault of the Panama Canal Company or of its employees.

3. The failure of the libelant to produce the chief officer and carpenter or any other personnel who should have been manning the anchors at the time of the accident warrants the inference that the testimony of such personnel, if produced, would have been unfavorable to the libelant. Moreover, it would appear that the absence of the chief officer from the bow constituted a statutory fault in view of the provisions of section 5.2 of the Navigation Regulations (35 CFR 4.31).

4. The absence of the chief engineer from the engine room in violation of 35 CFR 4.32 when the "emergency full astern" order was given by the Pilot placed a burden upon the libelant which required it to establish that the absence of the chief engineer from the engine room not only was not the cause of the disaster but that it could not have been. The Pennsylvania, 1873, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148. Libelant has not sustained this burden. On the contrary, the confusion in the engine room, manifested in the engine room bell book, appears to be directly related to the wrongful absence of the chief engineer from the engine room.

5. The libelant in its libel, had charged the respondent with specific acts of negligence and, in addition, indicated reliance on the doctrine of *res ipsa loquitur*. The libelant refused to answer interrogatories propounded to it in an attempt by respondent to obtain an elaboration of the specific charges of negligence and an order was entered precluding the libelant from introducing evidence relevant to such charges. In any event, the libelant made no attempt, or strong attempt, at trial to substantiate the charges of specific negligence and, apparently, relied upon the doctrine of *res ipsa loquitur*. No evidence was precluded under the order of preclusion. In brief, the libelant failed to prove by a fair preponderance of evidence that the casualty to the MS Charles L.D. was caused by any of the specific acts of negligence alleged in the libel.

6. Under the holdings of the Court of Appeals for the Fifth Circuit in the cases of Victorias Milling Co., Inc. v. Panama Canal Company, 272 F.2d 716 and Panama Canal Company v. Sociedad de Transportes Maritimos, 272 F.2d 726, the doctrine of *res ipsa loquitur* is not available to save libelant from its failure to prove its charges of specific negligence. On the contrary, the evidence adduced at trial establishes that the accident was probably caused by a failure of the vessel's steering mechanism and a failure of the vessel's personnel to execute promptly the orders of the Pilot to the rudder, engines and anchors. In the circumstances, the doctrine of *res ipsa loquitur* could not aid libelant's case even if it be assumed that it would otherwise be applicable. Victorias Milling Co., Inc. v. Panama Canal Company, D.C.C.Z. D.C.1958, 162 F.Supp. 185 affirmed 5 Cir., 272 F.2d 716, supra. Considering all of the evidence, certainly this Court cannot say that it is more probable than not that the casualty was caused by negligence of the respondent and this Court would not draw an inference that respondent was negligent even if it considered itself free to apply the doctrine of *res ipsa loquitur* under the general fact situation presented in this case. Sweeney v. Erving, 1913, 228 U.S. 233, 33 S. Ct. 416, 57 L.Ed. 815. Bruce v. Debuse Barras Company, D.C.E.D.La.1958, 169 F.Supp. 90, 93.

7. The Court has jurisdiction over the parties and the subject matter of the action.

8. The libel is dismissed with costs to the respondent.