ANDROS SHIPPING CO., Ltd., a corporation, Libelant,

v.

PANAMA CANAL COMPANY, a corporation, Respondent.

EMPRESA NACIONAL DEL PETROLEO, a corporation, Libelant,

v.

ANDROS SHIPPING CO., Ltd., a corporation, and the steamtanker THE ANDROS VENTURE, her engines, boilers, etc., and The Panama Canal Company, a corporation, Respondents.

Nos. 4317, 4340.

District Court, Canal Zone, Balboa Division.

May 9, 1960.

As Amended June 6, 1960.

Robles, Balboa, Canal Zone, for Andros Shipping Co., Ltd. and The Andros Venture.

Bentz, Markun, Daly & Dunn, Balboa Heights, Canal Zone, for Panama Canal Co.

Kirlin, Campbell & Keating, New York City, Roy Phillipps, Balboa, Canal Zone, for Empresa Nacional Del Petroleo.

GUTHRIE F. CROWE, District Judge.

### Findings of Fact

1. The Andros Venture, owned and operated by libelant-respondent Andros Shipping Co., Ltd., was built in Quebec, Canada, in 1953 and is a single screw tank vessel of 17,845 gross tons and 13,280 net tons with an overall length of 624.8 feet and a beam of 84.2 feet. Her mean authorized tropical salt water (T SW) draft is 33 feet 11⅞ inches. Her mean authorized tropical fresh water (TFW) draft is 34 feet 8⅞ inches. On the transit in question, the Andros Venture was carrying a cargo of crude oil in bulk which was owned by libelant Empresa Nacional del Petroleo, a corporation existing under the laws of the Republic of Chile. The propulsion engines of the Andros Venture are cross-compound, double reduction gear steam turbine with H.P. and L.P. and "astern" turbine units. Twenty-three nozzles are available to supply steam into the H.P. turbine and to turn the turbine wheel. Eleven of the nozzles are open at all times. The remainder of the nozzles may be used in various combinations to obtain desired power. The flow of steam through the nozzles is controlled by the throttle. During the transit in question, only 11 nozzle valves were actually supplying steam to the H.P. turbine of the Andros Venture. The manufacturer of the turbines recommends that all nozzles be open while maneuvering. The Chief Engineer was not aware of this recommendation. The use of only 11 nozzles rather than the recommended 23 nozzles resulted in a somewhat less rapid response to the ahead bells. The vessel is equipped with electric hydraulic steering gear. There are two 50 horsepower elec-

Healy, Baillie & Burke, New York City, L. S. Carrington, de Castro &

tric motors available to drive the rams which turn the rudder. The electric motors may be running simultaneously, but normally both should not be driving the rudder at the same time. If both motors are operating at the same time the movement of the rudder is more rapid, i. e., with one motor in operation the length of time to move the rudder from "hard over" to "hard over" would be about 28 to 30 seconds; with two motors in operation, length of time to move the rudder from "hard over" to "hard over" would be 16 to 17 seconds. (Libelant's answer to Interrogatory No. 6.) At the time of the bank striking, both motors were in operation. The vessel is equipped with engine and rudder-angle indicators located in the pilothouse. Neither type of indicator is located on the wings of the bridge. The Andros Venture is a sister ship of the Andros Fortune, both vessels having the same type of hull and propulsion engines which are capable of delivering the same amount of power. In Canal parlance, the Andros Venture and the Andros Fortune are known as "super vessels".

2. The rudder of the Andros Venture was not designed specifically in aid of navigation in restricted waters. The rudder of the Andros Venture has a relatively high aspect ratio, i. e., the ratio of the vertical length of the rudder to the horizontal length of the rudder is greater or "higher" than that normally recommended. The aspect ratio of the rudder is 2.13. Normal aspect ratio for a vessel of the type of the Andros Venture is between 1 and 1.5. A rudder with high aspect ratio tends to "breakdown" or experience a "burbling effect" at large rudder angles with the result that there is a sudden falling-off of rudder power when the "breakdown angle" is reached. The Andros Venture would experience rudder breakdown at an angle of 28 degrees and at 35 degrees the turning moment of the rudder would be no greater than if the rudder were at 19 degrees. The poor rudder design was accentuated by the fact that the rudder was being operated at greater than normal speeds,

i. e., being driven by two motors instead of one. Further, the rudder of the Andros Venture was of poor design because the ratio of rudder area as to the area of the submerged centerline plane was abnormally small for a vessel of the type of the Andros Venture. According to accepted criteria, the rudder should be approximately 1.5 to 2% of the submerged lateral plane. The rudder area of the Andros Venture is only 1.33% of the submerged lateral plane. The vessel's poor hull form in fact would warrant a larger rudder than indicated by acceptable criteria.

3. About two months prior to the arrival of the Andros Venture at the Panama Canal on the 22d of December, the vessel had suffered damage to her hull in a docking accident in Aruba. The damage was located on the port side slightly below the water line and was described on the repair invoice as: "J strake: shell plate No. 10 in J strake heavily set in. Renewed. Shell plate No. 11 in J strake set in at forward end over an area of five feet by seven feet." The damage also extended into K strake, plates No. 10 and No. 11. The cost of the repairs for the damage in question was $16,581.00. Such a hull irregularity would increase the frictional resistance on the vessel's hull and tend to create a drag on the port side which would affect, to some degree, vessel directional stability. Frictional resistance is increased in shoal waters to the extent that a source of resistance which might have no appreciable effect in open waters would manifest itself in restricted waters.

4. The voyage in question, Voyage No. 35, commenced at Puerto La Cruz. According to the Master's "Statement of Drafts" prepared after the accident of December 23, 1955, the Andros Venture's observed departure draft at Puerto La Cruz was 33 feet 7 inches forward and 34 feet 5 inches aft, or 34 feet 0 inches mean. However, the Plimsoll readings on the Ullage Report indicated that the vessel had a sag in the middle and that therefore, the actual draft or load condition of the vessel was in excess of the

mean arrived at from a reading of the forward and after drafts. According to the above-mentioned "Statement of Drafts", the calculated departure draft of the vessel at Puerto La Cruz was 34 feet 1½ inches. (To calculate draft, the total weight of cargo, fuel and stores plus a constant are taken. This gives a "deadweight". By reference to a "deadweight scale", calculated draft is arrived at.) In determining the calculated draft at Puerto La Cruz, 120 tons was used as the constant and stores, 65 tons was listed for water, 1,470 tons for fuel, and 27,440 tons for cargo. The calculated departure draft at Puerto La Cruz appearing on the Master's "Statement of Drafts" was therefore based upon cargo weighing 27,440 tons. However, on the "Accident and Damage Report" and in the "Panama Canal Company Declaration of Petroleum Products Carried", cargo was listed as being 27,567 tons. Substituting such tonnage for the tonnage used by the Master in calculating departure draft would increase the calculated departure draft at Puerto La Cruz by 1¼ inches, i. e., from 34 feet 1½ inches to 34 feet 2¾ inches or 2⅞ inches overload. According to the Ullage Report, which is based upon the actual measurement of cargo in the tanks, and which is accurate to ¼ inch (120 tons), cargo on board the Andros Venture for the transit in question was 27,794.7 tons. The calculated draft based on ullage recordings was 34 feet 5½ inches or 5⅝ inches more than allowable draft. The observed Plimsoll draft as set forth in the Ullage Report indicates a reading of 34 feet 6 inches. It is the Plimsoll mark which determines whether or not a vessel is complying with the Load Line statutes. Accepting the apparent reliability of the tonnage and Plimsoll reading indicated on the Ullage Report the arrival draft of the vessel at the Panama Canal was approximately 34 feet 3½ inches, i. e., the vessel was more than 3½ inches overdraft. [The vessel's deadweight had decreased 180 tons (1.8 inches) during the voyage from Puerto La Cruz to the Panama Canal, meaning that from being 5⅝ inches overdraft it

decreased, say 2 inches, to about 3⅝ inches overdraft.] Such overdraft would have the effect of decreasing the ratio of rudder area to the area of the submerged centerline plane, already abnormally small for a vessel of the type of the Andros Venture, and would thereby tend to reduce rudder effectiveness.

On arrival at the Atlantic entrance of the Panama Canal, preparatory to the southbound transit on December 23, 1955, the draft, as observed by the personnel of the Andros Venture, was 34 feet forward and 33 feet 11 inches aft. This draft reading did not give a true picture of the vessel's actual draft since, as noted above, the vessel had a sag in the middle. Knowing that Panama Canal pilots prefer that vessels be trimmed by the stern for better handling during transit, the Master ordered 330 barrels of fuel shifted aft. Another draft reading was taken after the transfer of bunkers which was reported as being 33 feet 8 inches forward and 34 feet 1 inch aft. According to this reading, the vessel was about 5 inches by the stern.

5. On the morning of the 23rd of December at about 0500 hours, Pilots Hector M. Grant and William R. Calcutt boarded the Andros Venture in Limon Bay for the transit. In the darkness they were unable to observe the vessel's draft. Upon boarding, the pilots went to the bridge where they questioned the Master concerning the vessel's draft. The Master indicated that the vessel was about on her marks with a slight drag of about 5 inches. Neither Pilot Grant nor Pilot Calcutt were informed by the Master that the vessel was overdraft or had a sag or of the hull damage sustained in Aruba. Since Pilot Calcutt's name appeared first on the assignment list, he was to have the conn of the vessel for the first leg of the transit from Limon Bay to Gamboa, with Pilot Grant having the conn for the remainder of the transit from Gamboa to the Pacific entrance. When two pilots are assigned to a vessel, as in the case of the Andros Venture, only the pilot at the conn has control of the vessel's navigation, the other pilot

being available to assist, particularly in the handling of the vessel in and around the locks. Pilot Calcutt asked the Master that the engine department be instructed to deliver 10 r. p. m. for "dead slow ahead", 40 r. p. m. for "half ahead" and 60 r. p. m. for "full ahead".

The vessel got underway under a "full ahead" bell through Cristobal Harbor and then entered the Gatun channel where speed was reduced to "half ahead". Speed was later reduced to "slow ahead" and still later to "dead slow ahead". As the vessel approached the north end of Gatun Locks, the engines were stopped and Pilot Calcutt ordered a tug placed alongside the port bow. For "quite some time" after the vessel's engines were stopped the vessel maintained her heading. The vessel then sheered to starboard. By use of the tug and the vessel's engines, the sheer was broken and the vessel proceeded into the Gatun Locks without further incident.

While in the Gatun Locks, locks personnel of the Panama Canal Company reported to Pilot Grant, who informed the Master of the Andros Venture that the vessel's draft was 34 feet 10 inches forward and 34 feet 11 inches aft. This meant the vessel was not five inches by the stern as the pilots had been informed by the Master, but only one inch by the stern. The Chief Officer, who was on the bow, made an independent reading of the vessel's forward draft in the locks which confirmed the Lockmaster's reading of excessive forward draft and transmitted this information to the vessel's Third Officer on the bridge. The Master, nonetheless, did not inform the Pilot of the reading taken by the Chief Officer and informed the Pilot that the reading taken by the Lockmaster seemed wrong and that the trim of the vessel had been corrected prior to entering the Canal. Pilot Grant requested that the vessel be given a six inch drag and apparently was led to believe by the Master that cargo was shifted and that subsequent draft readings taken by the vessel's personnel confirmed correction of the trim. The Master stated that following Pilot Grant's re-

quest that the trim of the vessel be altered, no further readings were taken by vessel's personnel but that the change of trim was "calculated" from the shifting of the bunkers. The Third Mate, Halcrow, who had supervised the shifting of bunkers on the night of arrival (December 22) and who was the watch officer on duty on the bridge during and after the time that the Andros Venture was in Gatun Locks, denied any knowledge that bunkers were shifted on the day of the accident. The Second Officer, Pyros, denied that any of the vessel's personnel had taken any draft readings while the vessel was in Gatum Locks. The testimony of the vessel's personnel on the shifting of bunkers is not convincing and even if bunkers had been shifted there is no reason to suppose that it had the desired effect. Bunkers had been shifted the night before apparently without creating the intended effect. Deeply laden vessels on an even keel do not handle as well as when they are trimmed by the stern. This is the reason Pilot Grant ordered that the vessel be given a decided six inch drag.

The vessel then proceeded to Gamboa without incident. On arriving at Gamboa Reach, Pilot Calcutt was required to "kill time" while awaiting a "clear Cut" which is required for the transit of all "super vessels". During this period, Pilot Calcutt noted that the vessel would always respond to rudder if the engines were turning ahead but would not respond if the engines were stopped even with "way" on the vessel.

In Gamboa Reach, at about 1145 hours, Pilot Grant took over the conn of the Andros Venture. The watch aboard the Andros Venture changed at about 1200 hours. From 1200 to 1224 hours the vessel proceeded under a "dead slow ahead" bell apparently without any difficulty. The vessel was met at Gamboa by the Tug San Pablo which was to render assistance through Gaillard Cut. At about 1240 the Andros Venture entered Gaillard Cut, with the San Pablo assisting ahead on a hawser of 300 feet in length. Pilot Grant's orders to the tug were to

proceed down the middle of Gaillard Cut on the center ranges at full speed. As the vessel entered Gaillard Cut, Pilot Grant requested revolutions per minute be reduced from 40 r. p. m. to 30 r. p. m. for "half ahead." The vessel then proceeded under a "half ahead" bell through the various reaches of Gaillard Cut for more than one hour without engine maneuvers and without difficulty at a speed of slightly less than six knots. Running time in Gaillard Cut on this particular transit was about the same as the running time of the Andros Venture on prior and subsequent transits. Pilot Calcutt on being relieved at Gamboa, remained on the bridge for a short while noting that the vessel was handling normally. He then went to the chart room just off the bridge where he remained available to assist Pilot Grant if needed. The vessel maneuvered fairly well and made most of the bends using about 20 degrees on the rudder. However, in making the turn at Gold Hill into Curaracha Reach, Pilot Grant was forced to use "full left rudder." Upon completing the turn the vessel was steadied in Curaracha Reach on the center range. Since the vessel was approaching Pedro Miguel Locks, Pilot Grant ordered the engine speed reduced from "half ahead" to "slow ahead" at about 1337 hours in order to begin to reduce the vessel's headway to the requisite one knot for entering the Locks. This was a reduction in engine speed of about 10 r. p. m. At about the same time, Pilot Grant asked the Master to instruct the engine department to return to regular maneuvering speeds, i. e., 10 r. p. m. for "dead slow ahead", 20 r. p. m. for "slow ahead", 40 r. p. m. for "half ahead" and 60 r. p. m. for "full ahead". At about 1339 hours, pilot Grant ordered the engines to "dead slow ahead" and ordered the tug, via radio, to begin "easing down". The tug Master reduced speed to about "half speed ahead". Approximately two minutes later, or 1342 hours while the vessel was on the center range, the vessel began to sheer to the right. Pilot Grant ordered "hard left" rudder and "slow ahead".

When the vessel did not respond, he ordered "half ahead", an order which would increase rudder force four-fold. There is some doubt that this order was executed, the Chief Engineer testifying at one point that there wasn't time to execute the order. Failure by the engine room to properly and promptly execute the "half ahead" order at this time would result in a delay in breaking of the sheer to starboard with the vessel thereby experiencing a greater amount of bank suction from the West Bank tending to swing the vessel's bow to port. The pilot called the tug Master and informed him that the vessel was sheering. However, the tug Master, having observed the stern of the tug being pulled away from the center range was already aware of the sheer. He immediately took an increased strain on the wire by increasing engine speed to "emergency full" power and commenced to pull toward the East Bank at an angle of about 45 degrees. At about this time, Pilot Calcutt, anticipating the vessel's approach to Pedro Miguel Locks, returned to the bridge and noted that the vessel had apparently taken a sheer but was recovering. He also noted that the vessel was about four ship's lengths into Curaracha Reach and about 30 feet to the West of the center line. He further noted that the rudder was "hard left" and that the engines were on "half ahead". Feeling certain that the vessel was recovering and in no danger, Pilot Calcutt went below to the "head", after noting that Pilot Grant ordered the wheel "amidships". The sheer to the right was broken at about 1343. The vessel then proceeded for a short time with engines on "dead slow ahead" and then began to sheer to the left (East Bank). Pilot Grant ordered "hard right rudder" and "half ahead". "Half ahead" was ordered at about 1344. At this juncture Pilot Calcutt returned to the bridge from the "head" and noticed that the vessel was swinging to the East Bank with her stem almost on the center line of the channel and her stern slightly to the west of the center line. He also noted that Pilot Grant had the rudder "hard right" and

that the engines were on "half ahead". The tug Master proceeded to pull at emergency power toward the West Bank at an angle of about 45 degrees. The vessel steadied up parallel to the East Bank at a distance of about ten feet. Pilots Grant and Calcutt and the Master at this point were standing on the port wing of the bridge in order to check the vessel's distance from the East Bank. At this point the vessel was proceeding under a "dead slow ahead" bell. In order to keep the stern of the vessel from swinging into the East Bank, Pilot Grant ordered "hard left rudder". Just when it appeared that the Andros Venture's bow was breaking to the right and the vessel was going to recover from the position of peril, the vessel set in laterally and struck the East Bank on the port bow at about 1347 hours at a speed of about four knots and then began to sheer to the West Bank. Approximately one-half minute prior to the striking, the engine room unexplainedly executed an unordered increase in engine revolutions from 10 r. p. m. to 40 r. p. m. (half ahead). Shortly before striking the East Bank the Pilot ordered the port anchor dropped. After the vessel struck the East Bank, the Pilot ordered the starboard anchor down and the engines placed "emergency full astern." On the "emergency full astern" bell, the engine department delivered in three minutes time only 65 r. p. m. although 85 r. p. m. had been developed on the vessel's engines on other occasions. The Andros Fortune, a sister ship of the Andros Venture, with the same type of propulsion engines, had on one occasion in the Panama Canal, produced 84 r. p. m. astern in approximately one minute when fully loaded. As the Andros Venture sheered to the West Bank, the tug was pulling toward the East Bank at a 45 degree angle under emergency full power. At 1350 hours the vessel's engines were stopped with the starboard bow against the West Bank. Thereafter the Tug Culebra was called and the Andros Venture was assisted to Pedro Miguel Locks by the Culebra and San Pablo without further incident.

6. The sheers of the Andros Venture appear to be in the category of "those unexplainable incidents which frequently occur in the navigation of vessels." Socony-Vacuum Oil Co., Inc. v. The George W. McWilliams, et al., D.C.S.D. Tex.1951, 101 F.Supp. 910, 912. As was said by this Court, at pages 2 and 3 of its opinion in Louis Dreyfus & Cie., etc. v. Panama Canal Company, D.C.C.Z., 180 F.Supp. 313, 314:

"These events (sheers) occur in confined waters and frequently the experts and triers of facts are confounded and find it most difficult to determine the true cause of the vessel's action.

"As written by Major General Glen E. Edgerton, U. S. A. (Ret.), former Governor of the Canal Zone at Panama and later only American member of a board of experts appointed to advise on the maintenance and improvement of the Suez Canal in an article appearing in the January 1957 edition of 'The National Geographic Magazine,'

" 'From the standpoint of the master accustomed to straight steaming in deep water, the most unnerving thing about a Suez transit is the sudden seeming insanity of his ship.

" ' "The old gal forgets all she's ever learned," one master of a huge tanker told me. "She acts like a colt in pasture. She's a different baby entirely."

" 'The reason is the peculiar action of water confined between the narrow banks. True, this sort of thing can occur in a dredged channel, in a shallow bay or in any narrow canal.' "

There are, of course, many possible explanations for a sheer. The irregularities of the Canal result in unbalanced forces requiring continuous corrective rudder action. Should the rudder, in the course of taking corrective action, happen to be tending to direct the vessel's head in the same direction as the bottom and bank suction forces created by such irregularities, a moderate sheer could de-

velop. In this case, the possibly poor trim, the vessel's indented hull, her overdraft, would constitute aggravating and complicating factors. In brief, sheers will occur—the real problem of shiphandlers is to determine the appropriate corrective action, and then obtain its prompt and proper execution by ship personnel.

7. The fact that the Andros Venture was overdraft, possibly not properly trimmed as ordered by the Pilot, had irregularities in the hull, had a rudder design which was proof for maneuvering in restricted waters and which was operated at a speed which tended to accentuate the poor rudder design and increase the possibility of "rudder breakdown", although not serious conditions individually, collectively created a condition which coupled with slow engine response, seriously hampered the correct efforts of Pilot Grant in breaking the sheer. Pilot Grant, who testified at the inquiry held by the Board of Local Inspectors of the Canal Zone Government on the evening following the accident, expressed the opinion at that inquiry that the cause of the accident was insufficient rudder power and the unusually slow response of the vessel's engines. Pilot Calcutt testified that when he had the conn, engine response was adequate.

8. The Tug San Pablo is 130 feet in length, 28 feet in beam, and has a draft of about 13 feet forward and 12 feet aft. The propulsion engines of the San Pablo are pilothouse controlled and deliver normally 1,000 horsepower. Up to 1,400 horsepower can be delivered on an emergency bell. The Tug San Pablo was in all respects adequate for the purpose for which it was used.

9. Pilot Hector M. Grant had been a Panama Canal Pilot for 15 years prior to the day of the accident. During the three years immediately preceding the day in question, he had piloted 302 vessels through the Panama Canal, many of them as large or larger than the Andros Venture. Pilot Grant was fully qualified to pilot the Andros Venture through the Panama Canal and was in all respects a competent Panama Canal Pilot. Pilot Grant died prior to trial and his testimony before the Board of Local Inspectors, given the day of the accident, was admitted in evidence by stipulation of all parties.

10. Pilot William R. Calcutt at the time of the trial had 43 years experience in the marine field and had been a Panama Canal Pilot for 22 years. He had piloted some 3,000 vessels through the Panama Canal, many of them as large or larger than the Andros Venture. Pilot Calcutt was fully qualified to pilot the Andros Venture through the Panama Canal and was in all respects a competent Panama Canal Pilot.

11. Captain Arthur C. Cherry, Master of the assisting Tug San Pablo, at the time of trial had experience in the marine field since 1928 and had been a towboat master since 1943. He was fully qualified to command the Tug San Pablo in assisting the Andros Venture through the Panama Canal and was in all respects a competent Panama Canal Towboat Master.

12. Chief Engineer Glen W. Winberg, who was in charge of the engine room of the San Pablo at the time of the accident, was an experienced and competent Chief Engineer. The action taken by him at all material times was in all respects proper.

13. Between July 1, 1946 and December 31, 1956, some 534 vessels 600 feet in length and over had transited the Panama Canal. Of these 534 vessels only the Andros Venture had been involved in an accident, i. e., the accident in question. Up to and including March 16, 1959, some 15 single screw turbine tank vessels of the same hull design as the Andros Venture had made some 93 transits of the Panama Canal without incident. All of the foregoing vessels had been assisted through the Gaillard Cut by a tug ahead on a hawser.

14. The testimony of the Master of the Andros Venture that the turn at Gold Hill was wide and that upon completing the turn, the vessel came to the

center line of the channel and then appeared to set in parallel to the East Bank is not substantiated by the evidence and conflicts with the testimony previously given by him and with the testimony of all other witnesses.

15. The engine room complement of the Andros Venture on the day of the accident consisted of six engineers: Dixon, the Chief Engineer; Negus, the Second; Morrison, a Fourth; Haldner, a Third; Dornan, a Junior Engineer; and Bechtler, a Junior Engineer. Morrison, Haldner and Dornan were the watch engineers. Of the six engineers, the Chief Engineer testified that four were licensed, i. e., Dixon, Negus, Morrison and Haldner. Section 115 of the Canada Shipping Act requires vessels of the size of the Andros Venture engaged in foreign trade to have a licensed First Class Engineer (Chief), a licensed Second Class Engineer, and a Fourth Class Engineer for each watch. Actually, Negus had no license at all. Haldner had a license for motor vessels only and was not thereby properly licensed to serve as an engineer on steam-propelled vessels. The Andros Venture, therefore, at the time of the bank-striking, had only two properly licensed engineers on board: Dixon, the Chief, and Morrison, the Fourth. There was no licensed Second Class Engineer. Two of the regular watch engineers were unlicensed. Neither did Negus have any special "permit" from the Canadian Government which would have entitled him to serve as a Second Engineer without the required license.

Oiler Gendron in January 1958 testified that Second Engineer Morrison was at the throttle at the time of the accident. The Chief Engineer, Dixon, testifying immediately after Gendron by deposition in January 1958, testified that he (the Chief Engineer) was at the throttle exclusively during the entire time that the vessel was in Gaillard Cut. Oiler Gendron's deposition, interrupted in January 1958, was continued in September 1958. At this time, Gendron testified that Second Engineer Negus and Chief Engineer Dixon took turns working the throttle at or about the time of the accident. Chief Engineer Dixon, who was called to testify at trial, admittedly to explain "discrepancies" between his former testimony and that of Oiler Gendron, maintained that he alone operated the throttle. When Chief Engineer Dixon testified by deposition in January 1958, he testified that at no time while the vessel was in Gaillard Cut did Gendron leave the telegraph. Gendron testified in September 1958 that he left the telegraph on two occasions when the vessel was in Gaillard Cut, once to get lemonade and once to put water on, or to take water off, the deck. Chief Dixon testified at the trial in April 1959 that he had no recollection of whether or not Gendron had left the telegraph while the vessel was in Gaillard Cut. Chief Engineer Dixon, by deposition in January 1958, stated that he made no entries in the Engine-room Bell Book except the symbol for "emergency" (full astern) and the "bump" symbol indicating the vessel's striking the bank. Gendron, under cross-examination in September 1958, testified that Chief Engineer Dixon had erased and altered entries in the Engine-room Bell Book, i. e., the entries at 1348 and 1351. When Chief Engineer Dixon testified at trial, he admitted the alterations indicated by Oiler Gendron. However, there appear to be additional alterations in the Engine-room Bell Book not mentioned by Gendron or by the Chief Engineer, Dixon, i. e., the "bump" symbol had originally appeared at 1348 but had been erased. Also, both Chief Engineer Dixon and Gendron testified that they did not know who made the entry at 1336½. This would indicate that at 1336½, at least, someone other than Chief Engineer Dixon and Gendron was on the operating platform. Chief Engineer Dixon testified by deposition that the vessel struck the East Bank after the order for "emergency full astern" was received in the engine room. At trial, he testified that the striking occurred before the "emergency full astern" was received.

16. The shipowner's evidence as to who was actually on watch in the engine room during the period in question per-

forming the various duties required in the maneuvering of the Andros Venture is in such conflict that this Court is unable to make a finding of fact in this regard. The Chief Engineer's ignorance of Oiler Gendron's leaving the telegraph, his confusion as to the sequence of "emergency full astern" and the striking, and the fact that an entry (1336½ hours) appears to have been made by an unidentifiable someone other than by him or Oiler Gendron at a time when he (Dixon) was supposedly at the throttle, causes one to seriously doubt that Chief Engineer Dixon was at the throttle. Libelant did not attempt to clarify the matter by producing at trial the testimony of Morrison, the watch engineer, or the testimony of Negus, the Second Engineer, who, according to Oiler Gendron's testimony, had been operating the throttles during the period in question. It is apparent, however, that the general management of the engine department of the Andros Venture was lax in that there was a lack of qualified licensed engineers to properly supervise the maintenance and operation of the vessel's engines. Improper maintenance and maneuvering of the vessel's engine would explain the slow response of the vessel's engines noted by Pilot Grant. In this connection, Chief Dixon testified that he did not know that navigators in confined waters use engine speed to increase rudder power. Also, if the final testimony of the Oiler, Gendron, is accepted, Negus, an unlicensed engineer, was operating the vessel's throttles at various times between 1300 and the time of the bank-striking. An experienced watch engineer, when maneuvering, builds up engine revolutions rapidly by delivering steam pressure at the throttle in excess of that needed to sustain the desired r. p. m. and then, after the r. p. m. have been built up, decreases the pressure to that necessary to sustain the desired r. p. m. The "half ahead" bell for 1342½ not being executed by the engine room and a "half ahead" bell being executed instead of "dead slow ahead" bell just prior to striking the East Bank would be explained by the

presence of inexperienced personnel at the throttles. Because of the size of the Andros Venture and its proximity to the banks in the Gaillard Cut, the safe margin for error or delay in the execution of engine orders is relatively narrow. The erasures and alterations which appeared in the Engine-room Bell Book were never adequately explained by the shipowner and it was impossible for the Court to ascertain what the entries were before they were altered. The Chief Engineer admitted on cross-examination that it was not proper to make alterations in log books or bell books by erasures but that incorrect entries should be lined out so still legible, the correction added, and the entry initialed.

17. The actions taken by the Pilot prior to and subsequent to the bank-striking were in all respects proper and in accordance with the practices of good piloting and seamanship.

18. The hawser between the Tug San Pablo and the Andros Venture was approximately 300 feet in length. The length of hawser used by Pilot Grant was in accordance with the established piloting and towing practices in the Panama Canal for the given size of the vessel.

19. The use of the San Pablo in placing her ahead on a single hawser approximately 300 feet in length to assist the Andros Venture through the Gaillard Cut was in accordance with the established practices of piloting and giving towing assistance to "live" super-vessels, i. e., super-vessels which have the use of their engines and rudder in the Panama Canal. The actions taken by the Towboat Master at all times while assisting the Andros Venture were in all respects proper and in accordance with good towing practices and seamanship.

20. The use of a tug ahead on a hawser to assist a "live" super-vessel in Gaillard Cut is much more effective than the use of a tug alongside, and it is clearly the safer method. The assertion that the tug should have been used astern is not substantiated by the evidence. This suggested method of tug assistance is apparently still in the experimental stage.

21. At the time and place of the accident, wind and current were negligible. "Surge" created by the drawing of water at Pedro Miguel Locks, if any existed at the time of the accident, was negligible and had no bearing on the accident.

### Conclusions of Law

1. This is the consolidated trial of a suit by the Andros Shipping Company, Ltd., the owner of the Andros Venture, against the Panama Canal Company and a suit by Empresa Nacional del Petroleo, the owner of the cargo aboard the Andros Venture, against the Panama Canal Company and the owner of the Andros Venture. The actions against the Panama Canal Company by the owner of the Andros Venture and by the owner of the cargo laden thereon are brought pursuant to subsection 10(b) of title 2 of the Canal Zone Code, as amended, as added by section 3 of the Act of September 26, 1950, Chapter 1049, 64 Stat. 1038, for damages sustained by the vessel when she struck the East and West Banks of the Panama Canal in Gaillard Cut on December 23, 1955, while being navigated by a Panama Canal Pilot. Under subsection 10(b) of title 2 of the Canal Zone Code, as amended, the Panama Canal Company is liable for injuries which a vessel and its cargo sustain by reason of negligence or fault of the Panama Canal Company or its officers, agents, or employees acting within the scope of their employment and in the line of their duties in connection with the operation of the Canal. The suit by the owner of cargo is brought against the owner of the Andros Venture as carrier of cargo under the terms of a Tanker Bill of Lading and a Tanker Voyage Charter Party.

2. The evidence establishes that every aspect of the control which respondent Panama Canal Company had over the vessel during the course of the transit of December 23, 1955 was exercised with due care both prior to and during the sheers which resulted in the bank-strikings. The bank-strikings were not caused by any fault of the Panama Canal Company or of its employees. More particularly, the Panama Canal Pilot in charge of the navigation of the vessel and the Tugboat Master in charge of the assisting Panama Canal Company tug at all times exercised the prudence and good judgment expected of navigators, and they cannot be found negligent merely because their efforts did not succeed in averting a casualty. Compagnie Generale Transatlantique v. Tawes, 5 Cir., 1940, 111 F.2d 92 certiorari denied, 311 U.S. 678, 61 S.Ct. 46, 85 L.Ed. 437.

3. Pilot Grant was established by the evidence to be a duly qualified Panama Canal Pilot and owed to the libelant only his best care, skill, and judgment. He was in no sense an insurer of the vessel's safety but must have exercised the care and skill of an expert such as is commonly possessed by others in his profession. Thus, although the resultant striking of the banks of the Canal may show that his judgment was wrong, he is not liable for her loss. 48 Am.Jur., "Shipping", Sec. 194.

4. The Andros Venture, contrary to Canadian statutory law (section 115 of the Canada Shipping Act, as amended) was not properly manned. Under Canadian law the Andros Venture was required to have in its complement, duly certificated, a first-class engineer, a second-class engineer, and, at least, a fourth-class engineer in charge of each watch. Two of the vessel's watch engineers were not duly licensed or certificated. The vessel's Second Engineer was not duly licensed or certificated. Under American law, requirements for the licensing of engineer watch officers are substantially similar. 46 U.S.C.A. § 224a. International Labor Convention No. 53 (1936), to which the United States and other leading maritime nations are parties, requires all watch-keeping engineers to be duly licensed by the member nations. Benedict on Admiralty (Sixth Edition), Vol. 6 at page 169 et seq. While Canada does not appear to be a party to the Convention, the language and purpose of the Canadian statute clearly parallel the language and purpose

of the Convention and the legislation of the United States implementing its obligations under the Convention. The Panama Canal is an international waterway used by vessels of all nations. As a minimum, a vessel that uses the waterway should be required to maintain standards of manning and equipment required by the law of the country whose flag the vessel flies. The violation of a Canadian statute constitutes a "statutory fault" cognizable by American Admiralty Courts. Richelieu & Navigation Co. v. Boston Insurance Co., 1889, 136 U.S. 408, 422, 10 S.Ct. 934, 34 L.Ed. 398. It is well settled that violation of a manning statute is a statutory fault. The Denali, 9 Cir., 1939, 105 F.2d 413; The New York American No. 10, 2 Cir., 1940, 109 F.2d 564. As stated in Gilmore & Black, The Law of Admiralty (1957) at page 702: "Furthermore, where the failure to man the ship adequately is in violation of a statutory duty and the ship comes into collision, the doctrine of 'statutory fault' will cause presumptions to run heavily against the shipowner".

■■ Under the rule of The Pennsylvania, 1873, 19 Wall. 125, 136, 22 L.Ed. 148 the party guilty of "statutory fault", to exculpate itself, must establish, not merely that the casualty *probably was not* caused by the fault, but that it *could not have been*. The rule of The Pennsylvania is applicable in case of allision. The Fort Fetterman v. South Carolina State Highway Dept., 4 Cir., 1958, 261 F. 2d 563 and cases cited therein at page 568. The libelant Andros Shipping Co., Ltd., did not sustain this burden. On the contrary, the manner in which the vessel's engines were maintained and operated by unlicensed and inexperienced personnel could well explain Pilot Grant's complaint before the Board of Local Inspectors of the unusually slow response of the vessel's engines.

■ 5. The overloading of the vessel was also contrary to Canadian statutory law (*sections 423 and 424 and Schedule 5 of the Canada Shipping Act, as amended*). The United States and Canada are parties to the International Load Line Convention (London, 1930). Benedict on Admiralty (Sixth Edition) Vol. 6 at page 91 et seq. "Overloading" of the Andros Venture was a "statutory fault" cognizable by an American Court of Admiralty. An overloaded vessel is always "unseaworthy." The Indien, 9 Cir., 1934, 71 F.2d 752. This Court cannot say on the evidence that the overloaded condition of the vessel *could not have* caused or contributed to the casualty. See Navegacion Castro Riva, S. A. of Panama v. The M/S Nordholm, D.C.E.D. La.1959, 178 F.Supp. 736, for an instructive opinion on the matter of "manning" and "overload". Further, the deliberate attempts of the Master and personnel of the vessel to conceal the overload from the Canal authorities and the Pilot and this Court do not reflect favorably on them or on their testimony.

■ 6. The failure of the Andros Venture to have her propulsion engines operating at maximum ahead power with all nozzles to the turbines open while transiting Gaillard Cut was a violation of section 5.3 of the Rules and Regulations Governing Navigation of the Panama Canal and Adjacent Waters (35 CFR 4.32). (It was also contrary to the recommendation of the manufacturer of the engines.) This violation of the Navigation Regulations of the Panama Canal should be visited with the same consequences as a statutory fault. Merritt-Chapman & Scott Corp. v. Cornell Steamship Co., etc., 2 Cir., 1959, 265 F.2d 537. (Violation of Coast Guard Regulation promulgated pursuant to statutory authority placed burden upon libelant of proving that said violation not merely probably did not cause, but could not have caused the accident in question.) The libelant Andros Shipping Co., Ltd., did not sustain the burden of proving that the failure to operate the vessel's engines under conditions of maximum ahead steam could not have caused or contributed to the accident. On the contrary, this disregard of the manufacturer's recommendation which apparently is directed to the same end as section 5.3 of the Navigation Regulations, super-

imposed upon human delay in the engine room, probably explains the unusually slow response of the vessel's engines.

7. The alterations in the vessel's Engine-room Bell Book were never satisfactorily explained. The vessel's engine-room personnel attempted to conceal the alterations and only admitted them under cross-examination. Their belated attempts to "reconstruct" the entries are not convincing in the absence of independent, trustworthy corroboration. The alterations and, in general, the conflicting and inconsistent testimony of the vessel's personnel casts a further cloud over the shipowner's entire case.

The unexplained alteration of a ship's record of maneuvers "not only cast suspicion on the whole case of the vessel, but creates a strong presumption that the erased matter was adverse to her contention". The Chicago, 9 Cir., 1937, 94 F.2d 754, 762.

In The Tillie, D.C.E.D.N.Y.1874, 23 Fed. Cas. pages 1266, 1267, No. 14,048, Judge Benedict stated:

"If possible, it ought never to happen that a case sought to be supported by a fabricated log-book should succeed; and while charges of this kind are not to be listened to unless based upon strong evidence, if they are supported by testimony and remain unanswered on the evidence, they compel an adverse decree".

In Capehorn Steamship Co. v. Texas Co., D.C.E.D.La.1957, 152 F.Supp. 33, at page 36, the Court stated: "Suffice it to say that under the law of the sea, when a party comes into court with log entries which will not stand the test of credibility, that party's chance of success in the litigation is little short of nonexistent".

8. The libelant Andros Shipping Company charged the respondent Panama Canal Company with specific acts of negligence, and, in addition, indicated reliance on the doctrine of res ipsa loquitur. Under the holdings of the Court of Appeals for the Fifth Circuit in the case of Victorias Milling Co., Inc. v. Panama Canal Company, 5 Cir., 1959, 272 F.2d 716, and Panama Canal Co. v. Sociedad De Transportes Maritimos, S. A., 5 Cir., 1959, 272 F.2d 726, the doctrine of res ipsa loquitur is not available to aid the shipowner. On the contrary, the evidence adduced at trial establishes that the accident was probably caused by a failure of the vessel's personnel to properly maintain and operate the vessel's engines, and by the contributing factors or accentuating conditions of overload, excessive speed of rudder movement, and, possibly, prior hull damage and poor trim, all discussed in the Findings of Fact, supra. In the circumstances, the doctrine of res ipsa loquitur could not aid the shipowner's case even if it be assumed that it would otherwise be applicable. Considering all of the evidence, certainly this Court cannot say that it is more probable than not that the casualty was caused by negligence of the respondent Panama Canal Company, and this Court would not draw an inference that respondent Panama Canal Company was negligent even if it considered itself free to apply the doctrine of res ipsa loquitur under the general fact situation presented in this case. Sweeney v. Erving, 1913, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815; Bruce v. Debuse Barras Co., D.C. E.D.La.1958, 169 F.Supp. 90, 93.

9. Even if it be assumed that all of the faults of the vessel could be explained away as not having caused or contributed to the accident, there would still remain the libelants' unsustained burden of proof of any fault on the part of the Panama Canal Company. The libelants must do more than raise a doubt in the mind of the trier of the facts or create a suspicion that the Panama Canal Company might have been negligent. Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 112, 62 S.Ct. 156, 86 L.Ed. 89.

10. The court has jurisdiction over the parties and the subject matter of the actions.

11. The libels against the Panama Canal Company are dismissed with costs to the Panama Canal Company.

12. A vessel is unseaworthy if she had not been made reasonably fit for the intended voyage. The Silvia, 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241; Edmond Weil, Inc. v. American West African Line, 2 Cir., 147 F.2d 363. The improper manning, overloading and faulty operation of the vessel's engines all constitute such unseaworthiness as to establish liability on the part of the Andros Shipping Company, Ltd. to the Empresa Nacional del Petroleo for damages and costs.